**MARYLAND STATE TEACHERS ASSOCIATION, INC., et al.**

v.

**Harry HUGHES, Governor of the State of Maryland, et al.**

**Civ. A. No. M–84–1435.**

United States District Court, D. Maryland.

Sept. 25, 1984.

Frank Cummings, Alicia M. Kershaw and Cummings & Kershaw, P.C., Washington, D.C., and Walter S. Levin, Baltimore, Md., for plaintiffs Md. State Teachers Ass'n, Inc., Md. State Educ. Services Council, Inc., Kenneth R. Bourn, Jr., Joseph T. Dunn, Jr., Thomas N. Ellis, Jane Elizabeth Hearn, Kathleen R. McGehrin, Karl Kirby Pence, Jr., and Gail Sears Riley.

J. Edward Davis and Monica L. Newman, Baltimore, Md., for plaintiffs Md. Classified Employees Ass'n, Walter S. Finster, Michael W. Marshall and Nika Jean Potts.

William H. Engelman and Kaplan, Heyman, Greenberg, Engelman & Belgrad, P.A., Baltimore, Md., for plaintiffs Md. Public Employees Council 67, American Federation of State, County and Mun. Employees (AFL–CIO), Md. Public Employees Council 92, American Federation of State, County and Mun. Employees (AFL–CIO), American Federation of State, County and Mun. Employees, Local 2250 (AFL–CIO), Baltimore Teachers Union, Local 340 (American Federation of Teachers, AFL–CIO), and Henry Simon, III, Alma ·C.· Brown, Hugh M. Johns, William S. Hudson, Jr., Harry N. Updegraff, Edith L. Simms, Ellouise Strock, John R. Johnson and William J. Flanigan.

Larry P. Weinberg and Kirschner, Weinberg, Dempsey, Walters & Willig, Washington, D.C., of counsel, for plaintiff American Federation of State, County and Mun. Employees, AFL–CIO.

Robert J. McIntosh, Washington, D.C., for plaintiff Assembly of Government Employees, affiliate of Md. Classified Employees Ass'n, Inc.

Stephen H. Sachs, Atty. Gen. of Md., Diana G. Motz, Robert A. Zarnoch, Linda H. Lamone, Carol S. Sugar, Susan K. Gauvey, and Jack Schwartz, Roberta M. Ward, Asst. Attys. Gen., Kathryn M. Rowe, Staff Atty., Baltimore, Md., for defendants.

John A. Austin, Towson, Md., for The Md. Ass'n of Counties, Inc., as amicus curiae.

George A. Nilson, Baltimore, Md., for Greater Baltimore Committee, Inc., as amicus curiae.

## OPINION

JAMES R. MILLER, Jr., District Judge.

On September 17, 1984, this court granted summary judgment to the defendants as to the claims made in this suit on behalf of the plaintiff class that the 1984 "Pension Reform Law" violates the Contract Clause of the United States Constitution and the Due Process Clause of the Fourteenth Amendment. The plaintiff class consists of those public school teachers and state employees who were, on December 31, 1979

and remain, members' of the Employees' Retirement System or the Teachers' Retirement System. This opinion is intended to set out briefly the rationale of the court's action.

## I. Factual Background

Until December 31, 1979, all Maryland teachers and state employees were required to become and remain members of, and contribute to, the Teachers' Retirement System or the Employees' Retirement System. Under those retirement systems, teachers and employees received defined retirement benefits and a full post-retirement cost of living adjustment (COLA), and, in return, they were required to make annual mandatory contributions of 5% of their respective salaries to the Retirement Systems.

In 1979, the Maryland General Assembly passed Senate Bill 394 and House Bill 634, codified at *Md.Code Ann.*, Art. 73B (1983), which established a two-tiered retirement/pension system for state employees and teachers in Maryland. Under the terms of the statute, a state employee or a teacher could choose to remain respectively in the Employees' Retirement System, *see Md.Code Ann.*, Art. 73B, § 3(9), or the Teachers' Retirement System, *see Md.Code Ann.*, Art. 73B, § 83(9), or could elect to transfer respectively to the Employees' Pension System or the Teachers' Pension System, *see Md.Code Ann.*, Art. 73B, §§ 31–32.

If transfer to the pension system were chosen, the cost of living adjustment on retirement benefits would be capped at 3%, *see Md.Code Ann.*, Art. 73B, § 120 and § 146, but no salary contributions would be required except as to salary in excess of the Social Security Wage Base. In addition, a transferring teacher or employee would receive a refund of a "part of his accumulated contributions [to the Retirement System] as of the date of transfer." *Md.Code Ann.*, Art. 73B, § 14(1)(g) and § 89(1)(e).

The statute provided that those employees or teachers who chose to remain in their respective retirement systems established under Article 73B and who did not elect at any time to transfer to their respective pension systems,

"shall, *as a condition of that person's employment contract*, be entitled to remain a member of the retirement system without change in the benefits provided in the retirement system as of December 31, 1979. Any person receiving benefits under the provisions of this subtitle on December 31, 1979 *shall continue to receive the benefits* as provided in the retirement system as of December 31, 1979. These benefits shall include but not be limited to:

(a) The eligibility for service retirement upon completion of 30 years service or attainment of age 60;

(b) The eligibility for a reduced service retirement upon completion of a certain length of service;

(c) The service retirement allowance of one fifty-fifth of average final compensation;

(d) The retirement allowances provided for ordinary or accidental disability;

(e) The selection of options for service or disability allowances;

(f) *The adjustment of the retirement allowance for increases in the Consumer Price Index;*

(g) The death benefit;

(h) *The level of contributions from members;* and

(i) The length of service for members to vest benefits in the system."

(Emphasis supplied), *Md.Code Ann.*, Art. 73B, § 3(9) and § 83(9).

Thus, those teachers and employees who chose to remain in the retirement systems would continue to contribute 5% of their salaries to the systems and would receive, at retirement, full cost of living adjustments.

In 1984, the Maryland legislature passed House Bill 991, the so-called "Pension Reform Law," which amended Article 73B, effective June 1, 1984. *See* Paper 35, Ex.A. Under the 1984 Act, four retirement benefit options, often referred to as the "menu plan," were substituted as the

choices available as of July 1, 1984 to members of the plaintiff class.

The first, *the transfer option,* allows for the transfer as of July 1, 1984, of all service credits from the retirement system to the pension system combined with a return to the employee of part of the employee's contribution to the retirement system. *See* H.B. 991, § 11B(5)(B) and § 86B(6)(B).

*The bifurcated option* allows an employee or teacher to keep his service credits accumulated before July 1, 1984 in the retirement system at benefit levels available as of December 31, 1979, subject to full cost of living adjustments. For service credited after July 1, 1984, benefits would accrue under the pension system formula subject to a 3% cost of living cap. No employee contributions would be required after July 1, 1984 unless the employee/teacher earned in excess of the Social Security maximum. *See* H.B. 911, §§ 3(9)(C), 11B, and §§ 83(9)(B), 86B.

Under *the 5%/5% option,* past and future service credits would remain in the retirement system but cost of living adjustments would be limited to 5% as to all service, past and future, and employee contributions would continue at 5% of total salary. *See* H.B. 991, § 11C and § 86C.

Finally, if an employee/teacher chose *the 7% option,* past and future service credits would remain in the retirement system with full cost of living adjustments, but effective July 1, 1984, employee contributions to the system would increase from 5% of salary to 7% of salary. *See* H.B. 991, § 11D and § 86D.

The nub of the plaintiffs' suit is their allegation that the 1979 Act, created a contract between the State and the employees and teachers governed by the Act and that the 1984 amendments unjustifiably impaired the contract in a substantial way in violation of Article I, Section 10 of the Federal Constitution, the Contract Clause.

Jurisdiction exists in this court under 28 U.S.C. § 1331.

## II. *Contract Clause*

### A. *Legal Framework Applicable*

In an apparent shift of emphasis,[1] the Supreme Court recently has revitalized Contract Clause [2] jurisprudence in striking down state legislative action in two cases, *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), and *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).

The first case arose out of earlier legislation by the New York and New Jersey legislatures empowering the Port Authority to take over a financially troubled passenger railroad running between New York City and Newark. To relieve investor concern over this added financial burden, the legislatures passed a statutory covenant to the effect that, so long as certain contemplated bonds of the Authority were outstanding and the consent of the bond holders had not been obtained, the Port Authority could not use any revenues or reserves "which have been or shall be pledged in whole or in part as security for such bonds, for any railroad purposes whatsoever other than permitted purposes hereinafter set forth." 1962 N.J.Laws, c. 8, § 6; 1962 N.Y.Laws, c. 209, § 6, quoted in *United States Trust,* 431 U.S. at 10, 97 S.Ct. at 1511. Pursuant to this legislation, the Port Authority took over the operation of the railroad in 1962, raising the capital with which to make the acquisition through the sale of bonds to private investors.

By 1973, the actual deficits incurred by the Port Authority from operating its transit system had exceeded the permitted deficits under the statutory covenant, thereby preventing the Port Authority from issuing any new bonds for any new money-losing passenger railroad facilities. Meanwhile,

---

**1.** *See generally* Note, A Process-Oriented Approach to the Contract Clause, 89 Yale L.J. 1623 (1980); Note, Rediscovering The Contract Clause, 97 Harvard L.Rev. 1414 (1984); Schwartz, *Old Wine In Old Bottles? The Renaissance of the Contract Clause* (1979) Supreme Court Rev. 95; Note, Revival of the Contract Clause, 65 Va.L.Rev. 377 (1979).

**2.** U.S. Const. art. I, § 10, cl. 1 ("No State shall ... pass any ... Law impairing the Obligation of Contracts....").

public pressure for greater participation of the Port Authority in mass transit operations increased as the oil shortage of the early 1970's became critical. In response, the legislatures of both states in 1974 repealed the 1962 covenant. United States Trust Company, the holder of outstanding Port Authority bonds, sued to overturn the repeal on the basis that the legislative action violated the Contract Clause. The New Jersey Supreme Court affirmed the trial court's dismissal of the suit on appeal[3] on the ground that the repeal of the covenant was a reasonable exercise of the police power of the states and therefore not a violation of the Contract Clause.

The second case arose out of a Minnesota law, enacted in 1974, subjecting employers to a pension funding charge if, upon termination of a pension plan or the closure of an office in Minnesota, the employer failed to provide full pensions for all employees who had worked for the company for at least ten years. Until 1974, Minnesota had no pension fund legislation. The statute required the employer under those circumstances to make up the deficiency between the amount in the pension fund and the amount needed to provide pensions for such employees. The pension plan of Allied Structural Steel Company provided, in general, that only those employees who reached the age of sixty five while still employed by it were entitled to a pension. Under the plan, the company was the sole contributor to the pension trust fund, and each year it made contributions to the fund based on actuarial predictions of eventual payment needs.

Shortly after the statute was enacted, the company closed its Minnesota office, leaving at least nine discharged employees who had worked there for ten years or more without vested rights under the company's pension plan. The state notified the company that, under the newly enacted law, the company owed a pension funding charge of approximately $185,000. The company sued, claiming that the statute unconstitutionally impaired its contractual

obligations to its employees under the pension agreement. The three-judge federal trial court upheld the validity of the statute as an appropriate exercise of the State's police power.[4]

In *United States Trust Co.*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), the Supreme Court set forth the analysis applicable in cases involving alleged Contract Clause violations when a state is a party to the contract. *United States Trust* requires the court to address two preliminary matters prior to inquiring whether the Contract Clause has been violated. *Id.* at 17, 97 S.Ct. at 1515.

■ First, the court must ascertain if a contractual obligation was created by a statute. *Id.* at 17, 97 S.Ct. at 1515. "In general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State. In addition, statutes governing the interpretation and enforcement of contracts may be regarded as forming part of the obligation of contracts made under their aegis." *Id.* at 17 n. 14, 97 S.Ct. at 1515 n. 14. Finally, "[t]he obligations of a contract long have been regarded as including not only the express terms but also the contemporaneous state law pertaining to interpretation and enforcement." *Id.* at 19 n. 17, 97 S.Ct. at 1516 n. 17.

Second, the court must determine if the State's actions impaired the obligation of the State's contract. *Id.* at 19–21, 97 S.Ct. at 1516–1517. In *United States Trust*, the Court addressed impairment briefly finding that the state law did not merely modify or replace the old law with "an arguably comparable security provision," but that the new law was an "outright repeal" which "totally eliminated an important security provision and thus impaired the obligation of the States' contract." *Id.* at 19, 97 S.Ct. at 1516.

---

3. 69 N.J. 253, 353 A.2d 514, 515 (1976).

4. *Fleck v. Spannaus,* 449 F.Supp. 644 (D.Minn. 1977).

The Court, relying on past precedent, said in *United States Trust* that not every impairment by a State of its own apparent contractual obligations is prohibited by the Contract Clause. *Id.* at 21, 97 S.Ct. at 1517. The " 'essential attributes of sovereign power,' [quoting *Home Building & Loan Assn. v. Blaisdell,* 290 U.S. 398 at 435, 54 S.Ct. 231 at 239, 78 L.Ed. 413 (1934) ], necessarily reserved by the States to safeguard the welfare of their citizens," *id.,* impose a limit on the operation of the Contract Clause in two ways.

■ In the case of an apparent contract to which a state is a party, the reserved powers doctrine renders void *ab initio* a state contract which "surrenders an essential attribute of its sovereignty," *id.* 431 U.S. at 23, 97 S.Ct. at 1518, since a " 'legislature cannot bargain away the police power of a State,' " *id,* quoting *Stone v. Mississippi,* 101 U.S. (11 Otto) 814 at 817, 25 L.Ed. 1079 (1880).

■ In the case of contracts between private parties or contracts of a state which do not involve a surrender of what the Court sees as "an essential attribute of its sovereignty," a state in the exercise of its police power may constitutionally impair the contractual obligations and rights of private parties, in the former case, or those imposed by its own contract, in the latter case, if the legislation doing so is reasonable and necessary to serve a legitimate or important public purpose. *Id.* 431 U.S. at 21–26, 97 S.Ct. at 1517–1520; *Spannaus,* 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727. *See also Energy Reserves Group v. Kansas Power & Light,* 459 U.S. 400, 411–12, 103 S.Ct. 697, 704–05, 74 L.Ed.2d 569 (1983).

■ Where a state's own contract is involved, *"complete* deference [by a reviewing court] to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." (Emphasis supplied) *United States Trust Co.,* 431 U.S. at 26, 97 S.Ct. at 1519. In the case of a legislative impairment by a state of a contract between private parties, however, "courts properly defer to legislative judgment as to the ne-

cessity and reasonableness of a particular measure." *Id.* at 23, 97 S.Ct. at 1518. The severity of the impairment, which must be "substantial" in any event to involve the Contract Clause, *Spannaus,* 438 U.S. at 244–45, 98 S.Ct. at 2722–23; *Energy Reserves Group,* 459 U.S. at 411, 103 S.Ct. at 705, "increase[s] the level of scrutiny to which the legislation will be subjected." *Id.*

■ The legitimate expectations of the contracting parties must be examined to determine whether the impairment complained of is "substantial" as well as to determine its level of severity. *United States Trust Co.,* 431 U.S. at 19–20 n. 17, 97 S.Ct. at 1516–1517 n. 17; *Spannaus,* 438 U.S. at 245–46, 98 S.Ct. at 2722–23; *Energy Reserves Group,* 459 U.S. at 411, 103 S.Ct. at 704. While "[t]otal destruction of contractual expectations is not necessary for a finding of substantial impairment," *Energy Reserves Group,* 459 U.S. at 411, 103 S.Ct. at 705, citing *United States Trust Co.,* 431 U.S. at 26–27, 97 S.Ct. at 1519–1520, "state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment." *Energy Reserves Group,* 459 U.S. at 411, 103 S.Ct. at 705.

■ A factor to be considered in determining the legitimate expectations of the contracting parties and, as a result the extent of the impairment, if any, is whether, at least in cases involving areas formally subject to state regulations, "the industry the complaining party has entered has been regulated in the past." *Id.*

■ A very important prerequisite to the applicability of the Contract Clause at all to an asserted impairment of a contract by state legislative action is that the challenged law operate with retrospective, not prospective effect. *Ogden v. Saunders,* 12 Wheat. 213, 6 L.Ed. 606 (1827). *See also Old Wine in Old Bottles: The Renaissance of the Contract Clause,* [1979] Supreme Court Rev. 95, 99. *United States Trust Co., supra,* explicitly restates the existence of statutory retroactivity as a

necessary predicate for the applicability of the Contract Clause. *United States Trust Co.*, 431 U.S. at 18 n. 15, 97 S.Ct. at 1515 n. 15. The opinions in both *United States Trust Co.* and *Spannaus* strongly assert that the challenged legislation involved was retroactive and thus, inferentially, impaired the subject contracts. *United States Trust Co.*, 431 U.S. at 14, 97 S.Ct. at 1513; *Spannaus*, 438 U.S. at 246, 247, 249, 98 S.Ct. at 2723, 2724, 2725. No Supreme Court decision has been found in this court's research which has invalidated a non-retroactive state statute on the basis of the Contract Clause.

 If it has been determined that a contract exists which has been substantially impaired by subsequent legislative action, then, as previously explained, the third question a reviewing court must decide is whether the challenged legislation is reasonable and necessary to serve a legitimate or important public purpose. It is at this level of analysis that a more strict review is necessary to be applied to contracts of a state than to solely private contracts since the state's self-interest might cause its legislature to make legislative findings and judgments which are not objective but prejudiced in favor of the state. *United States Trust Co.*, 431 U.S. at 26, 97 S.Ct. at 1519. Nevertheless, this is not to say that the legislative history and findings are to be ignored or that the court is to sit as a super legislature, making its own totally independent assessment of reasonableness and necessity. As the Court in *United States Trust Co.* said, 431 U.S. at 26, 97 S.Ct. at 1519, it is only *"complete* deference" (emphasis supplied) to the legislative findings which is to be avoided. And, in both public as well as private contract cases, the level of court scrutiny will vary directly with the extent of the contractual impairment imposed by the challenged legislation. *Energy Reserves Group*, 459 U.S., at 411, 103 S.Ct., at 704.

In *El Paso v. Simmons*, 379 U.S. 497, at 508–09, 85 S.Ct. 577, at 583–84, 13 L.Ed.2d 446 (1965), the most recent Contract Clause decision prior to *United States Trust Co.*, *supra*, and one of those decisions to which the Court in *United States Trust Co.* spe-

cifically gave "due respect," 431 U.S., at 16, 97 S.Ct., at 1515, the Court referred to the judicial respect due to the " 'wide discretion on the part of the legislature in determining what is and what is not necessary,' " quoting *East New York Savings Bank v. Hahn*, 326 U.S. 230, 232–33, 66 S.Ct. 69, 70–71, 90 L.Ed. 34 (1945). The Court in *El Paso v. Simmons* went on to say, as had Supreme Court decisions before it, e.g., *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934), and as did *United States Trust Co.*, 431 U.S. at 22, 97 S.Ct. at 1517, after it, that a state nevertheless could not " 'adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them,' " 379 U.S. at 509, 85 S.Ct. at 584, quoting *Blaisdell*, 290 U.S. at 439, 54 S.Ct. at 240. *El Paso v. Simmons*, it should be noted, was a case involving a legislative contract with the State of Texas relating to the sale of state lands.

 In short, as this court reads *United States Trust Co.*, *supra*, and the other recent Contract Clause cases, no hard and fast rule exists requiring strict scrutiny of all legislative actions said to constitute a state's impairment of its own contract. But a reviewing court must bear in mind in such a case, when examining legislative statements as to the reasonableness and necessity for such actions, that more strict than usual examination of the facts underlying those statements should be conducted, *United States Trust Co.*, 431 U.S. at 26, 97 S.Ct. at 1519, and that the state may not justify an impairment of its contractual financial obligations to others simply because it would rather spend the money for some other public purpose, *id.* at 29, 97 S.Ct. at 1521.

When considering whether a state has shown that its legislative actions, having the effect of substantially impairing its own prior contract, are nevertheless "reasonable and necessary to serve an important public purpose," *id.* at 25, 97 S.Ct. at 1519, the reviewing court has been given guidance by the Supreme Court in *United*

*States Trust Co.* as to the meaning of the terms "reasonable and necessary" in that context.

■ Reasonableness is to be judged in the light of whether the prior state contractual obligations or counterpart private rights "had effects that were unforeseen and unintended by the legislature" when the "contract" creating those obligations and rights was created. *Id.* at 31, 97 S.Ct. at 1522.

■ Necessity is to be judged on two levels: 1) whether a less drastic modification could have been implemented; and 2) whether, even without modification, the State could have achieved its stated goals. *Id.* at 29–30, 97 S.Ct. at 1521–1522.

### B. *Is There A Contract?*

For the purposes of this decision, it has been assumed, without deciding, that the 1979 Act created a contract between the State and its employees and teachers.

■ If the contract were irrevocable, it appears to this court that such a contract would be void *ab initio* since it would have "surrender[ed] an essential element of [the State's] sovereignty." *United States Trust Co.,* 431 at 23, 97 S.Ct. at 1518. The contract here at issue does not relate to a municipal bond authorization, such as was involved in *United States Trust Co., supra,* where a state is not in truth acting as a sovereignty but is reduced to the level of an ordinary individual seeking to borrow money and contracting to repay it with interest. *Id.* at 25 n. 23, 97 S.Ct. at 1519 n. 23. Instead, the contract at issue here is one dealing with the level of compensation to be paid State employees and teachers for their services to the State. Such a contract is not one as to which one legislature can bind subsequent legislatures for work and services to be performed by State employees and teachers *in the future. See, e.g., Newtown v. Commissioners,* 100 U.S. (10 Otto) 548, 559, 25 L.Ed. 710 (1879) (under the police power a state may "increase or diminish the salary or change the mode of compensation"); *Butler v. Pennsylvania,* 10 Howard 402, 416, 13 L.Ed. 472 (1851) (regulation of compensation is part of the

"class of powers and obligations by which governments are enabled, and are called upon, to foster and promote the general good; functions, therefore, which governments cannot be presumed to have surrendered...."); *see also Arceneaux v. Treen,* 671 F.2d 128, 135 (5th Cir.1982); *Local Division 589 v. Commonwealth of Massachusetts,* 666 F.2d 618, 641 (1st Cir.1981), *cert. denied,* 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982).

In fact, the plaintiffs, presumably recognizing the preposterousness of a position that a contract of this type is irrevocable, admit that the contract asserted to exist here may be altered (Paper 47, at 26).

■ Under Maryland law, the State has reserved the power to amend or alter pension contracts, and that reserved power "... is part of each pension plan which a legislature enacts, whether explicitly or not." *Baker v. Baltimore,* 487 F.Supp. 461, 468 (D.Md.1980), *aff'd,* 660 F.2d 488 (4th Cir.1981); *see also City of Frederick v. Quinn,* 35 Md.App. 626, 371 A.2d 724 (1977).

■ As Judge Kaufman stated in *Baker v. Baltimore, supra,* "what alterations in [the pension system] are permissible is [governed by] the law of the state which ... took such action or actions." *Id.* at 466.

In *City of Frederick v. Quinn, supra,* the court stated that "[e]ach case where a changed plan is substituted must be analyzed on its record to determine whether the change was reasonably intended to preserve the integrity of the pension system by enhancing its actuarial soundness, as a reasonable change promoting the paramount interest of the State without serious detriment to the employee. In short, the employee must have available substantially the program he bargained for and any diminution thereof must be balanced by other benefits or justified by countervailing equities for the public's welfare." 35 Md.App. at 631, 371 A.2d 724.

■ In essence, *Quinn* calls for the court to determine whether the changes to

the pension system tend to enhance the actuarial soundness of the plan. If the answer to that inquiry is affirmative, the court must also assess the detriment to the employees. A diminution in benefits may be found non-serious if the benefits lost are offset by benefits received or if the loss is justified by countervailing public welfare equities. The standard of review of the validity of State legislative action in the exercise of its police power is well established in Maryland. *See Supermarkets Gen. Corp. v. State,* 286 Md. 611, 616–17, 409 A.2d 250 (1979); *Edgewood Nursing Home v. Maxwell,* 282 Md. 422, 427, 384 A.2d 748 (1978); *Governor v. Exxon Corp.,* 279 Md. 410, 424–25, 370 A.2d 1102 (1976); *A & H Transp., Inc. v. Baltimore,* 249 Md. 518, 528–29, 240 A.2d 601 (1968).

The validity of the 1984 Act as a matter of State law will be analyzed in Part II.D. of this Opinion.

### C. *Was There An Impairment?*

The glaring fact emerging from the welter of documents and affidavits in the record here is that the challenged legislation does *not* operate to deny vested or merely earned pension rights retroactively.

As to pensions which have already vested and were being paid on the effective date of the legislation, the 1984 Act specifically states that no such pension benefits are intended to be modified or changed. 1984 Md.Laws Chap. 7.[5]

As to pensions which, although not vested technically, have been earned as of July

1, 1984, in the sense that an employee has earned pro rata future pension benefits as he or she worked day by day up to July 1, 1984,[6] the provisions of the 1984 Act give the employee an absolute right to protect those earned pension benefits. The bifurcated option of the "menu plan" allows all members of the plaintiff class to keep their full service credits accumulated before July 1, 1984, in the retirement system at benefit levels available as of December 31, 1979, subject to full cost of living adjustments. Only for service rendered after July 1, 1984, are benefits accrued under the pension system formula of .8% of average final compensation, instead of 1.8% as under the retirement system, and subject to a 3% cost of living cap. Under the bifurcated option, no employee contributions are required after July 1, 1984, unless the employee earns thereafter in excess of the Social Security maximum, now $37,800 as set out in 42 U.S.C. § 430, 48 Fed.Reg. 50414 (Nov. 1, 1983). 1984 Md.Laws Chap. 7, §§ 3(9)(C), 11B, and §§ 83(9)(B), 86B. In short, the members of the plaintiff class have it within their power by choosing the bifurcated option to protect all of the pension benefits which they have earned under the old retirement system by their work up to the effective date of the 1984 Act. In this most important sense, therefore, the 1984 Act, as contrasted with the effect of the invalid statutes involved in *United States Trust Co., supra,* and *Spannaus, supra,* do not retroactively deprive the plaintiff

---

**5.** 1984 Maryland Laws Chapter 7 purported to repeal and reenact with amendments Chapter 23, Laws of 1979, section 3 and Chapter 24, Laws of 1979, by stating: "Except As Modified By Chapter ____ Of the Acts of 1984 (S.B. ____ or H.B. ____ 41r1916)" the retirement benefits of any beneficiary of the retirement systems are not altered or changed.

According to the Legislative Reference Bureau, "S.B. 647" was to be inserted into those blanks, but S.B. 647 was not passed by the legislature. Therefore, the Act's statement that the benefits of those who are retired are not altered or changed is not modified by an exception.

**6.** Pursuant to *Md.Code Ann.,* Art. 73B, § 11(16) and § 86(10), a member of the retirement sys-

tem who has rendered 5 or more years of creditable service has a vested right to pension benefits upon retirement. Retirement, under usual circumstances, may occur after a member reaches the age of 60 or has rendered the requisite years of creditable service. *Md.Code Ann.,* Art. 73B, § 11(1) and § 81(1). That is not to say that the entitlement to a specific dollar amount of pension benefits vests in the employee, but rather that the right to some benefits vests as they are proratedly earned. As demonstrated in *City of Frederick v. Quinn,* 35 Md.App. 626, 371 A.2d 724 (1977), the State has no "right to withdraw retroactively the pro rata pension benefits that [have] accrued," but the State may modify prospectively the amount of benefits. *Id.* at 630–31, 371 A.2d 724.

class of benefits or rights for which they had bargained.

In *United States Trust Co.,* the security provided to the bond holders when they purchased their bonds years before was "outright repeal[ed]." 431 U.S. at 19, 97 S.Ct. at 1516. The affected parties in that case had no way to protect the benefits of their bargain which had accrued when they bought their bonds.

In *Spannaus,* the affected party was required to treat employees' *prior* employment time as if their pension rights had vested and to make retroactive payments to the pension fund to make the fund actuarially sound on that basis. 438 U.S. at 246–47, 98 S.Ct. at 2723–24. The affected party there, Allied Structural Steel Co., had no way to protect the benefits of its bargain with its employees that benefits for prior employment time would, in general, vest only if the employees remained employed until age sixty five.

The first affidavit of the plaintiffs' actuary, Mr. Claude Poulin, does not rebut this court's conclusion stated above. His analysis of the bifurcated option relates solely to pension benefits earned pro rata for *future* employment periods and ignores the fact that pension benefits earned pro rata for *past* employment periods will not be adversely affected (Paper 36, Attachment, p. 0270, *et seq.*). In fact, Mr. Poulin's second affidavit admits that under the bifurcated option the retirement system benefits for employment *before* July 1, 1984, are *exactly the same* under the 1984 Act as they were under the 1979 Act (Paper 47, Attachment p. 0610). Based on Mr. Poulin's second affidavit, there is absolutely no dispute of fact on this point.

The defendants' actuary, Mr. Eugene Kalwarski, also points out in his third affidavit (Paper 46, Attachment) that, under the 7% option of the "menu plan," there is *no reduction* in benefits to be paid by the Retirement Systems. *"Prospectively,* employees are required to increase their contribution rate from 5% to 7% (a 40% rate increase). Past contributions made by the affected members are not adjusted; for example, a member who has already con-

tributed to the Retirement System at 5% for twenty five years and has five years to go would only contribute an additional 12% (rather than 40%) in *total* contributions." Kalwarski third affidavit, Paper 46, Attachment, p. 2. Even when considering the effect of *future* employment service and increased employee contributions for that *future* service, Mr. Kalwarski points out, using the methodology and assumptions of Mr. Poulin, the "worst case scenario" of the 7% option results in a *maximum* benefit loss of well under two percent for any current member of the Retirement Systems. *Id.* pp. 3–4.

In addition, the legitimate expectations of the plaintiff class did not include an immutable, unalterable pension plan as to *future* benefits to be earned pro rata by *future* employment service. As earlier noted, not only would such a contract have been void *ab initio* as a surrender of an essential element of the State's sovereignty, but writings from the Office of the Maryland Attorney General and an opinion of the Court of Special Appeals of Maryland roughly contemporaneous with the 1979 Act should have made anyone interested aware that Maryland law would not extend unalterable contractual protection against change in pension benefits which were to be earned on a pro rata basis by employment service in the future. 61 *Opinions of the Attorney General* 746 (1976); *City of Frederick v. Quinn,* 35 Md.App. 626, 630–31, 371 A.2d 724 (1977); Letter of Advice to Senator Melvin A. Steinberg, dated February 22, 1979, Paper 35, Attachment 3 to Exh. H.

■ Without belaboring the point further, this court has concluded on the basis of the undisputed facts in the record that the purported contract rights of the plaintiff class have not been impaired by the 1984 Act.

D. *Is The 1984 Act Reasonable and Necessary To Serve An Important Public Purpose?*

■ To the extent, if any, the 1984 Act impairs the contractual interests of the plaintiff class, the 1984 Act was prompted

by an important and legitimate public purpose.

In 1975, the Maryland legislature asked the question, "Are the Maryland Retirement Systems a financial time bomb?" *See* Paper 35, Pension Study Committee, Report to the 1978 Maryland General Assembly at 4, Ex. G 11. To answer that question, the legislature submitted the Maryland Retirement Systems to two independent studies, the Coopers and Lybrand Study and the Winklevoss Study. *See* Paper 35, Exs. G 3a, G 9a, G 9b. Both studies concluded that Maryland's plan for funding its retirement systems would lead to serious financial consequences, not only by increasing the burden on future Maryland taxpayers, but also by threatening the financial soundness of the retirement systems. *See* Pension Study Committee, Report to the 1978 Maryland General Assembly, at 17–26, Paper 35, Ex. G 11.

Therefore, in 1978, the Pension Study Committee of the Maryland General Assembly recommended to the legislature a pension reform package which it predicted would "result in financially sound State Retirement Systems with the costs of the Systems spread in a more equitable fashion between present and future taxpayers in Maryland." *Id.* at 26.

The center point of the Committee's recommendation was the creation of a two-tiered retirement/pension system and a recommendation for full advance funding of a system for providing retirement benefits. *Id.* at 26–35. No recommendation was made concerning reductions or caps on the cost of living adjustment.

In 1979, the Maryland legislature passed the pension reform legislation which created the two-tiered retirement/pension system allowing transfer from the retirement to the pension system if a member so chose. The 1979 Act also provided for full actuarial funding of both the Retirement and Pension Systems. *See Md. Code Ann.,* Art. 73B, § 14. *See also* Paper 35, Ex. G 15 at 5.

The fiscal note attached to the bill projected annual costs of the legislation to require an additional $32.1 million appropriation in fiscal year 1981 increasing to an additional $35.3 million in 1990, but with annual savings to commence before the year 2000. *See* Fiscal Note, Paper 35, Ex. Y at 9. "A key assumption used in the actuarial analysis [was] that approximately 40 percent of the present membership in the Employees and Teachers Pension [sic] Systems [would] elect to transfer to the new system." *Id.* at 8.

In the first six months after the 1979 Act was passed, approximately 32% of the State employees transferred to the new Pension System, but only 18% of the teachers opted for the new system. *See* Admission # 50, Ex. II, Paper 35.

As of June 30, 1982, 55% of the State employees and 32% of the teachers had joined the Pension System. *See* Joint Committee on Pensions 1982 Interim Technical Supplement, at 5, paper 35, Ex. G 15. Although membership in the Teachers Retirement System declined, "the total payroll of the System, on which the State's contribution is based, remained static, reflecting salary increases granted by local boards of education." *Id.* It was also reported by the Joint Committee on Pensions that:

"In 1980 an 'experience investigation' (comparison of actual experience with actuarial assumptions) was conducted for the Teachers Retirement Systems. It revealed that terminations for reasons other than retirement were not as great as assumed, that members of the system were retiring in substantial numbers at early moments, and that retirees were living longer than anticipated. These factors necessitated an increase in the State's contribution of 3.5% of payroll. This increase is being phased in at the rate of 1.14% in each of the fiscal years 1983, 1984, and 1985. In fiscal 1985 all of the State systems will undergo another 'experience investigation.' *The actuary attributes the heavy retirement rate experience whereby teachers in the old system retire as soon as eligible to the unlimited cost-of-living provisions.*"

(Emphasis supplied). *Id.* at 5.

In addition, from 1980 to 1983 several other problems surfaced which further un-

dermined the actuarial assumptions upon which the 1979 Act was based.

First, when the 1979 legislation was considered and enacted, it was assumed that municipal corporations would bear approximately the same cost increases as the State in the advance funding formula. *See* Joint Committee on Pensions, 1981 Interim Report at 11, Paper 35, Ex. KK. Due to different demographic characteristics of the workforce of participating municipal corporations and a drafting error in the 1979 legislation regarding the method used to pay off accrued liabilities of the system, pension costs to municipal corporations increased significantly. *Id.* at 12. After the 1980 funding valuation by state actuaries, "[t]he flat annual payments of the 'municipal corporations' increased from roughly $4 million annually to somewhat more than $12 million." *See* 1984 Report of the Joint Legislative & Executive Committee on Pensions, at 22, Paper 35, Ex. NN. Because the financial hardship on the municipal corporations was severe, a three-year moratorium was imposed on municipal corporations' payments to the system. *Id.*

Second, in June 1981, the State's actuary reported that its computation of the allowance for the cost of living adjustments in the 1979 projection of costs of the pension reform legislation was done on a simple rather than a compounded basis as was required by law. *See* Paper 35, Ex. G 15, at 6 & 21. "When this was corrected the State's unfunded accrued liability and contributions substantially increased." *Id.* at 6.[7]

Third, a drastic increase in inflation from 1979 to 1983 occurred aggravating the already existing COLA problem. In 1979, state actuaries assumed a 5% cost of living adjustment per year, but the inflation rate far exceeded that assumption. Stettler Af-

fidavit, Table 1, Consumer Price Index, Paper 35, Ex. JJ. The cost of living increase to state retirees in fiscal year 1981 was 11.3%; in fiscal year 1982, 13.5%; and in 1983, 10.4%. *See* Report of the Joint Legislative & Executive Committee on Pensions, at 27 (January, 1984), Paper 35, Ex. NN.

In January, 1983, when the Joint Pension Committee reported to the legislature on the financial condition of the State Retirement and Pension Systems, it stated:

"It is evident that the overall situation is not improving yet. Exhibit D shows the State's unfunded accrued liability has increased at a rate far greater than the annual 5% expected when full-funding was adopted in 1979. Much of this increase can be attributed to the COLA. These attributions include; an error in the interpretation of the COLA computation (Exhibit F), adverse actuarial experience (Exhibit G) attributed to the unlimited cost-of-living adjustments in the Teachers Retirement System (Exhibit H), and actuarial losses due to inflation exceeding the assumed 5% annually."

*See* Joint Committee on Pensions, 1982 Interim Technical Supplement, at 14, Paper 35, Ex. G 15.

The actuarial error and the unpredictable COLA led to the need for an appropriation of $432.2 million for fiscal 1984 to fund the retirement/pension systems.[8] That figure was nearly $103 million higher than the 1983 budget figure,[9] and $46 million higher than had been previously predicted by State actuaries. Stettler Affidavit, ¶ 18, Paper 35, Ex. JJ.

Thus in January, 1983, the Joint Legislative and Executive Committee on Pensions was formed to study the problems inherent in the Retirement/Pension Systems. Executive Order, 01.01.1983.10, Paper 35, Ex.

---

**7.** This error apparently has long term effects on the State's budget. The $30.1 million actuarial error apparently increased the unfunded accrued liability of the system by $578 million in a single year. "The miscalculation will require extra millions in additional funding each year for approximately 38 more years—estimated at $1.2 billion." *See* Stettler affidavit ¶ 17, Paper 35, Ex. JJ.

**8.** Of the $432.2 million to be appropriated, $362 million would have to come from the State's general fund. *See* Paper 35, Ex. JJ ¶ 18.

**9.** Of the $103 million increase, $94 million would have to come from the general fund. *See* Paper 35, Ex. JJ ¶ 18.

NN at 45. One of the major problems was in the funding of the systems. The Joint Committee's report to the legislature summarized the funding problem as follows:

"In 1979 when Chapters 23 & 24 were enacted fully funding all of the State's pension obligations it was anticipated that the future contribution rate would be constant at approximately 11.66% of the applicable payroll. The State's proposed contribution for fiscal 1985 will be 16.93% of the applicable payroll, up from 16.60% in fiscal 1984.

The State's proposed 1985 appropriation of $444.5 million at the 16.93% rate is $138.3 million, or 45%, greater than was anticipated at the 11.66% rate that had been expected to be in effect when Chapters 23 & 24 were enacted in 1979.

In 1975 when the Pension Study Commission began its study to fully actuarially fund the State's retirement obligations the annual retirement costs consumed 5.6% of the annual General Fund appropriations. When the fiscal 1981 budget, the first with full actuarial funding, was adopted during the 1980 session the State's retirement costs took 6.9% of all General Fund appropriations. When the fiscal 1984 budget was adopted at the 1983 session of the General Assembly retirement costs took 10.5% of the General Fund budget. Even with substantially better investment results during the past year the fiscal 1985 budget presented to the legislature by the Governor calls for 10.2% of the General Fund budget to go for retirement costs.

When measured by the accounting standards of the Financial Accounting Standards Board (FASB) utilizing the interest rates promulgated by the Public Benefits Guaranty Corporation (PBGC), standards utilized to measure the status of all private pension plans, the State is having difficulty maintaining its sound actuarially funded position, even with the foregoing substantial budget reallocation of public resources.... [Table omitted]

Amongst the six individual retirement and pension systems the State maintains[,] Assest [sic] as a Percent of Vested Benefits varies widely. This reflects the plans with which the State is encountering difficulties, other than the Judicial Pension Plan which was mature, but had never been actuarially funded prior to 1980. [Table omitted]

The decrease in the vested benefits as a percentage covered by assets in the Employees Retirement System and the Teachers Retirement System improved between fiscal 1982 and 1983. This improvement was due to a very substantial increase in the value of the assets when the S & P 500 Stock Index moved from the 800 level in June of 1982 to the 1200 level in June of 1983, and the approximate interest rate level fell from 14.5% to 11.0% in the same period, thus increasing the value of the MRS & PS trust fund from $2,631.5 million to $3,790.8 million, or by some 44% and $1,159.3 million.

On an actuarial basis the State's unfunded accured [sic] liabilities are continuing to increase, even with the very substantial increase in the value of the assets during fiscal 1983. [Table omitted]

The funding of the State's retirement systems from year to year is quite unstable. Since 1980, when full actuarial funding went into effect, overall General Fund budget appropriations have increased at a rate between 1.5% to 10.9% annually. However, General Fund appropriations for the retirement system contributions have increased at a rate between 4.6% and 34.9% annually. The proportion of the total General Fund increase that has gone to increases in retirement costs has ranged from 6.5% to 49.6% annually. This has created substantial instability in the State's fiscal planning process.... [Table omitted]"

Report of the Joint Legislative & Executive Committee on Pensions at 15–16 (January, 1984), Paper 35, Ex. NN.

Based on that report, and the recommendations in it for reform, the legislature amended the 1979 Act introducing the four retirement system options described previously as the "menu plan."

There can be no rational argument that the 1984 Act was not prompted by an important and legitimate public purpose in the face of this recitation of the undisputed facts.

■ At the heart of the controversy herein is the unlimited cost of living adjustment (COLA) contained in the 1979 Act. The plaintiffs contend mainly that the cap placed on the COLA by the 1984 Act[10] and the additional 2% of future salary contributions required of members who wish to retain unlimited COLA benefits make up the substantial impairment that the plaintiffs suffer. The defendants, on the other hand, point to the unlimited COLA as one of the main problems in maintaining an actuarially sound plan.

It cannot be questioned that an unlimited COLA is a desirable benefit for retirees from their standpoint. As the plaintiffs state, "[w]ith a full COLA, the plan members are fully protected against the risk of inflation." Paper 36, at 40. That risk is borne by the State, and the retiree's purchasing power remains the same as he/she acquired on the date of retirement. To retain that benefit based on *future* employment service, an employee or teacher, under the 1984 Act, must pay an additional 2% of salary—increased by the 1984 Act from 5% to 7%.

Nor can it be questioned that capping the COLA lends predictability to the retirement system costs and enhances the system's actuarial soundness. *See* Coopers & Lybrand, Study of the Maryland Retirement System, at 4–11 & 4–12 (June 1, 1976), Paper 35, Ex. G 3(a). One need not be an actuary[11] to conclude that predictable cost of living increases for future retirees stablizes cash in-flow and out-flow projections, allows for sounder investment strategies, and provides a more predictable basis for actuarial assumptions. Each of those outcomes tends to increase the actuarial soundness of a pension system.

The plaintiffs argue that the State's retirement/pension systems were sound in 1984 and point to the cover letter to the Milliman and Robertson Study submitted to the Board of Trustees for the Maryland State Retirement and Pension Systems in 1983 as proof that the systems were sound. Eugene Kalwarski, consulting actuary from Milliman and Robertson, stated in that letter: "The most recent actuarial valuation of the systems as of June 30, 1982 indicated that the systems are in sound actuarial condition but that the pattern of budget cost projections is not sufficiently predictable." *See* Documents and Evidence in Support of Plaintiffs' Motion for Summary Judgment, at 201, Paper 36, Attachment.

Accepting the conclusion of actuarial soundness of the systems as true, this court observes that neither *Baker v. Baltimore, supra,* nor *City of Frederick v. Quinn, supra,* requires as a matter of State law that the legislature wait until a pension system is actuarially unsound before making changes in that system. Certainly, there is no such federal constitutional requirement. Such a requirement would jeopardize the pension benefits of current and future retirees, would require that the trustees of the Retirement Systems abdicate their role as fiduciaries, and would impose an irrational limitation on the legislature's police power. A pension system need not be actuarially unsound before a legislature may move to change the system and the benefits it provides its members.

The record reviewed herein compels the conclusion that the Retirement Systems were, in fact, threatened. The 1979 Act, which created the two-tiered retirement/pension system designed to move a percentage of state employees and teachers from their respective full COLA benefits retirement systems to the pension systems with a 3% COLA cap, was predicted to "result in financially sound State Retire-

---

**10.** But as has been pointed out in Part II.C of this Opinion, no cap is placed under the bifurcated option on the COLA for benefits based on employment prior to July 1, 1984.

**11.** The actuaries on each side of this controversy agree that capping the COLA enhances predictability in the system. *See* Poulin Deposition at 57, Paper 40, Ex. 2; Kalwarski Affidavit, ¶ 10(b), Paper 35, Ex. AAAA.

ment Systems with costs of the Systems spread in a more equitable fashion between present and future taxpayers in Maryland." *See* Pension Study Committee, Report to the 1978 Session of the Maryland General Assembly, at 26, Paper 35, Ex. G 11.

Reports to the legislature in succeeding years indicated that the prediction was erroneous. In 1981, the Joint Committee on Pensions reported the actuarial error in the COLA assumptions used to make actuarial projections for the 1979 Act. Its report stated, "The Joint Committee on Pensions recognizes the budget situation of state and local governments is such that automatic cost-of-living adjustments equivalent to the consumer price index cannot be afforded." *See* Joint Committee on Pensions, 1981 Interim Report at 70, Paper 35, Ex. KK. The Committee recommended further study of the COLA problem. *Id.*

The 1982 Interim Report to the legislature echoed similar problems in the financial condition of the State Retirement and Pension Systems and placed much of the blame on the unlimited COLA. *See* Joint Committee on Pensions, 1982 Interim Technical Supplement at 14, Paper 35, Ex. G 15.

Finally, in 1984, the Joint Legislative & Executive Committee reported that the State was "having difficulty maintaining its sound actuarially funded position...." *See* Report of the Joint Legislative & Executive Committee on Pensions at 15 (January, 1984), Paper 35, Ex. NN. It recommended the four option menu plan as a possible solution to the problem.

It is the conclusion of this court that the legislature responded to the problem it perceived as threatening to the systems and it moved to enhance the actuarial soundness of the pension systems when it passed the 1984 amendment offering the four option menu plan. That piece of legislation directly addressed the problems perceived to be caused by the unlimited COLA.

In short, after years of studying the problem, the legislature addressed the problem in 1979, confidently predicting that the 1979 legislation would result in a financially sound retirement system where cost could be spread more equitably between present and future taxpayers. Pension Study Committee, Report to the 1978 Maryland General Assembly at p. 26, Paper 35, Ex. G 11.

By 1984, that confident prediction had not been borne out, and the Joint Legislative & Executive Committee reported to the legislature that the instability in funding the State's retirement system "has created substantial instability in the State's fiscal planning process ...." Report of the Joint Legislative & Executive Committee on Pensions at 16 (January, 1984), Paper 35, Ex. NN.

The plaintiffs consistently argue that the State is not in a financial crises and that its bond rating is AAA. But, as the defendants point out, the financial soundness of a state's pension system is directly related to the bond rating.

Standard & Poor's, which has given Maryland a AAA bond rating, finds state pension fund requirements "particularly notable" in their credit rating analysis. *See* Standard & Poor's Credit Overview at 11, Paper 35, Ex. X3. That rating agency conducts analyses "to determine the suitability of the cost method being used to fund the pension system, and the adequacy of the assumptions employed." *Id.* In February, 1984, Standard & Poor's expressed serious concern regarding Maryland's financial position. It indicated that the State's "financial position, measured by fund balance and free general fund cash, is low ..." and while it agreed "that the State's economy, cash flow and financial operations are stable, and may reduce the need to carry large balances, we feel that issuers rated AAA should retain a cushion in their financial position as an added degree of strength. The cushion in Maryland's case is disappointly [sic] low, and virtually non-existent." *See* Letter from Managing Vice President, Standard & Poor's, to Louis Goldstein, February 7, 1984, Paper 35, Ex. X5.

The financial position of the State's pension system clearly affects that "cushion." Maryland funds its pension debt for the

most part from the general fund, *see* nn 8 & 9, *supra.*

In February, 1984, Oppenheimer & Co., Inc., a brokerage house, gave Maryland an A+ rating stating, "Total debt (including G.O. [General Obligation] debt of $752 per capita, an unfunded pension liability of $1,272 plus M.O. [Moral Obligation] debt) of $2,201 per capita or 8.7% Actual Value singularly precludes an AAA equivalent rating." *See* Municipal Credit Analysis, Oppenheimer & Co., Inc. at 1 (February 1, 1984), Paper 35, Ex. X4. The brokerage house also noted, "Again, as in prior years, the total debt increased significantly due to an increase in unfunded pension liability from $1,175 per capita to $1,272." *Id.* at 2. While noting that increases in total debt related to unfunded pension liability, it commented that the General Obligation debt had remained "relatively unchanged" and that the Moral Obligation debt had remained "stable" over the years. *Id.*

Although it is impossible to conclude with certainty that the 1984 Act will solve the financial problems identified as serious, the Act clearly enhances the State's ability to plan fiscal strategies more accurately by placing some cap on pension costs.

The 1984 Act was a reasonable response to an important public concern. It addressed the perceived cause of the problem, the unlimited COLA, and did so with little or no impairment to State employees or teachers. "The extent of impairment is certainly a relevant factor in determining reasonableness." *United States Trust Co.*, 431 U.S. at 27, 97 S.Ct. at 1520. This court has found the impairment to be minimal at worst.

Also relevant to the reasonableness inquiry is whether the 1979 Act "had effects that were unforeseen and unintended." *Id.* at 31. Unpredicted high levels of inflation increasing the cost of living adjustment yearly, fewer transfers from the retirement system to the pension system than anticipated, and actuarial error in computing the cost of living adjustments led to financial problems within the retirement/pension systems which impacted on the State's fiscal planning abilities. The intended effect of the 1979 Act was to stabilize financially the retirement/pension systems. Unforeseen factors eroded that intended effect. Thus changed circumstances "caused the [contract] to have a substantially different impact in [1984] than when it was adopted in [1979]." *Id.* at 32, 97 S.Ct. at 1523.

Under the circumstances described herein the modifications under the 1984 Act were reasonable, particularly in light of the fact that the impairment, if any, was minimal.

Not only were the modifications reasonable, they were necessary modifications. *United States Trust Co.* instructs the court to consider the nature of the modification. "[A] State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." *Id.* at 31, 97 S.Ct. at 1522. In addition, a court is to examine whether "without modifying the covenant at all, the State could have adopted alternative means of achieving [its] ... goals...." *Id.* at 30, 97 S.Ct. at 1522.

Initially, the court reiterates that the impairment, if any, was not a drastic one. Unlike the impairment in *United States Trust Co.*, characterized as a "total repeal of the covenant," *id.* at 29–30, 97 S.Ct. at 1521, the impairment, if one exists at all, is minimal.

*United States Trust Co.* explains that "[t]he Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations" if the modification is reasonable and necessary. 431 U.S. at 25, 97 S.Ct. at 1519. When a *financial obligation* [12] is modified, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at

---

12. What type of contract should be characterized as a financial obligation alone may not always be clear, but *United States Trust Co.* intimates that when a state throws off its mantle of sovereignty and contracts like a private individual, the contract is purely financial. 431 U.S. at 25 & n. 23, 97 S.Ct. at 1519 & n. 23.

stake." *Id.* at 26, 97 S.Ct. at 1519. In *United States Trust Co.*, the contract at issue, a municipal bond contract, was found to be "purely financial." *Id.* at 25, 97 S.Ct. at 1519. Such is not the case at bar.

In the area of pension reform, unlike the area of municipal bonds, the issues are multifaceted. Projections as to the effect of a particular piece of legislation, like the 1979 Act, are based on actuarial assumptions which may or may not turn out to be accurate. In fact, at oral argument, the plaintiffs' attorney referred to actuaries as "pension bookies." They provide to the legislature their best prediction, but there can be no guarantee that what they predict for the future will actually occur.

The contract herein concerns, not a clear financial obligation, but a complex retirement/pension system. It addresses components of that system, the cost of living adjustment and the contribution a member must make to the retirement system.

Therefore, while the court must look carefully at the necessity for the modification to assure itself that the State's self interest is not masking the facts, once the facts are brought to light the court should not act as a super legislature and attempt to second guess which legislative act would have better solved the perceived problem. The legislature has the responsibility and the discretion to act on the facts and information at its disposal.

This court cannot conclude that an evident and more moderate course was available to the legislature. The plaintiffs suggest that problems related to insufficient transfers from the retirement to the pension systems could have been addressed by a refund to induce more transfers, or they suggest that costs due to factors within local jurisdiction's control (*i.e.*, salary increases) could have been allocated to the local jurisdiction. Paper 36 at 54. It is not *evident* to this court that either suggested alternative is less drastic than the one the legislature chose. Because the impairment was not a drastic impairment and because a more moderate course does not clearly evidence itself, this court will defer to the judgment of the legislature.

Similarly, this court will defer to the legislative judgment that there existed no alternative means of accomplishing the legislature's goal which could have avoided modifying the 1979 Act. Perhaps, H.B. 1664 (Chapter 290) (Paper 35, Ex. B), a bill linked to H.B. 991, might be argued to be an alternative and sufficient means to control the pension system costs.

H.B. 1664 was passed on May 8, 1984, one month after H.B. 991,

> "[f]or the purpose of providing for the funding of the State pension and retirement systems by changing provisions for employer contributions to the State systems and the optional system and by reviewing the costs of funding certain liabilities of the systems; providing for the investment of the assets in the State pension and retirement funds; providing for health insurance benefits for retirees . . .; providing for the extension of or the participation under certain circumstances in the moratorium on certain payments by local governments for a certain period of time; stating the purpose of this Act; and generally relating to the funds and assets of the State pension and retirement systems."

*See* 1984 Md.Laws Ch. 290 (Paper 35, Ex. B).

The legislature apparently considered H.B. 1664 as an *additional* way of addressing the financial stability of the retirement/pension systems and not an alternative solution to the problem created by the unlimited COLA. This court cannot outguess the legislature in this area. It does not have resources to do so nor, in the opinion of this court, could it do so without overstepping the proper bounds of its power.

To conclude, for all the reasons stated, the 1984 Act modifying the Pension Reform Act of 1979 does not violate the Contract Clause of the United States Constitution. Similarly, the 1984 Act modifies the 1979 Act in a way that complies with state

law as set forth in *City of Frederick v. Quinn*, 35 Md.App. 626, 371 A.2d 724 (1977).

### III. *Due Process Clause*

█ For the reasons set forth herein, the 1984 Act does not violate the Due Process Clause of the United States Constitution. "The Due Process Clause of the Fourteenth Amendment generally does not prohibit retrospective civil legislation, unless the consequences are particularly 'harsh and oppressive.'" *United States Trust Co.*, 431 U.S. at 17 n. 13, 97 S.Ct. at 1515 n. 13.

In *Pension Benefit Guaranty Corp. v. R.A. Gray Co.*, — U.S. —, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), the Supreme Court reiterated the standard used to determine if legislation, in particular retrospective legislation, violates the Due Process Clause. Noting that "[i]t is now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality and that the burden is on the one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way," *id.* at —, 104 S.Ct. at 2717–18, *citing Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976), the Court "further explained that the strong deference accorded legislation in the field of . . . economic policy is no less applicable when the legislation is applied retroactively. Provided that the retroactive application of a statute is supported by legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches...." *Pension Benefit Guaranty Corp.*, — U.S. at —, 104 S.Ct. at 2718.

Whether the 1984 Act at issue here is considered a prospective or retrospective piece of legislation, it appears for the reasons set forth herein that the legislation is justified by a rational legislative purpose.

The facts indicate that the legislature was validly concerned about the financial soundness of the Retirement/Pension Systems, the increasing monetary burden it placed and would continue to place on Maryland taxpayers, and the impact of the inherent unpredictability in the Retirement Systems' cost of living increases on the ability of the State to plan in a fiscally sound manner.

The legislature's reaction to those concerns, the "menu plan" set out in the 1984 Act, was a response rationally related to the legislative purposes of financially stabilizing the Retirement Systems, spreading their cost more equitably across present and future Maryland taxpayers and enhancing the ability of the State to plan fiscally.

These legislative purposes have been scrutinized herein and the 1984 Act has been found not in violation of the Contract Clause. Suffice it to say that "less searching standards [are] imposed on economic legislation by the Due Process Clause" than those imposed on the States by the Contract Clause. *Id.* at —, 104 S.Ct. at 2720. In fact, the Supreme Court has "never held . . . that the principles embodied in the Fifth Amendment Due Process Clause are coextensive with prohibitions existing against state impairments of pre-existing contracts." *Id.*

In short, the 1984 Act amending the 1979 Pension Reform Act does not violate the Contract Clause or the Due Process Clause of the United States Constitution.