**BALTIMORE CITY LODGE NO. 3 FRATERNAL ORDER OF POLICE**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE CITY.**

**BALTIMORE TEACHERS UNION, et al.**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE, et al.**

Civ. Nos. Y–92–228, Y–92–440.

United States District Court, D. Maryland.

Sept. 18, 1992.

---

Michael Marshall and Herbert R. Weiner, Baltimore, Md., for plaintiff Baltimore City Lodge No. 3, Fraternal Order of Police.

Joel A. Smith, Lutherville, Md., for plaintiff Baltimore Teachers Union, AFT Local 340 and City Union of Baltimore, AFT Local 800.

Neal M. Janey, City Sol., Ambrose T. Hartman, Deputy City Sol., William R. Phelan, Jr., Sr. Sol., and James S. Ruckle, Jr., Asst. Sol., Baltimore, Md., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, Senior District Judge.

On January 16, 1992, Baltimore City implemented a "payroll reduction plan," which placed all City employees on five days of unpaid furlough. (the "Furlough Plan" or "Plan"). The Plan was in response to an anticipated $13.3 million dollar cut in State aid to the City of Baltimore. The Baltimore Teachers Union, the City Union of Baltimore, and the Fraternal Order of Police ("Plaintiffs") brought suit challenging the Furlough Plan as an unconstitutional impairment of the terms of their respective labor agreements with the City.

On April 3, 1992, while cross motions for summary judgment were pending before the Court, the State enacted the Budget Reconciliation Act for Fiscal 1992 (the "Act").[1] Instead of the previously forecast $13.3 million dollar cut, the new Act cut state aid to Baltimore by 4.7 million.[2] With the anticipated fiscal crisis diffused, the City cancelled the Furlough Plan on April 15, 1992.

For the five pay periods that the Plan was in effect (January 16 through April 15), City employees lost the equivalent of 2.5 days of pay, or .95% of their gross annual salaries. The cost to an employee earning $13,000 per year was $124; to an employee earning $20,000 per year, $190; and to an employee earning $30,000 per year, $285. The City saved approximately $2 million dollars as a result of the Plan, and does not plan to reimburse City employees for wages withheld during this period. Plaintiffs then filed a supplemental

motion for summary judgment claiming the right to be reimbursed for funds withheld.

The City argues that it remains in a fiscal crisis due to shortfalls in local revenues, and other unanticipated expenses. The City argues that the Furlough Plan was implemented pursuant to the "Neall Amendment" to the Budget Reconciliation Act which authorized the City to "take any action necessary, including any action to reduce a previously approved appropriation, to prudently manage its fiscal affairs and to meet its obligations" in light of the cuts in State aid.[3] The City also contends that the payroll reduction plan resulted in a minimal impairment to the labor agreements negotiated between the City and City Employees, and thus does not rise to the level of an unconstitutional contractual impairment.

■ The proper analysis of an alleged Contract Clause violation, begins with the determination of whether a contract indeed exists. *United States Trust Co. v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). On November 19, 1991, the FOP and the City executed two Memoranda of Understanding governing the wages, terms and conditions of employment for City police personnel. The MOU was negotiated pursuant to the Municipal Employee Relations Ordinance—City Charter, Art. II, Sec. 55(a)(3)—which authorizes the City to negotiate "collective bargaining agreements" setting forth such things as "salaries, wages, hours and other matters relating to employee benefits and duties[.]" *See*, City Code, Art I, Sec. 120(k). Although the Memoranda were negotiated well into fiscal year 1992, the City and the unions reached agreement over the issue of compensation before fiscal 1992 began, and those figures were approved by the City Board of Estimates and enacted into law by the City Council.[4]

---

**1.** Acts of the General Assembly, Chapter 62 (1992).

**2.** The actual reduction in State aid for fiscal 1992 was $4,676,957.

**3.** Several issues raised in the initial cross motions for summary judgment appear to have

been abandoned. These include the issue of "separation of powers," the Fair Labor Standards Act, and common law breach of contract and promissory estoppel.

**4.** The City of Baltimore has what is commonly termed an "executive budget system", and the Board of Estimates is at the heart of that sys-

The Board of School Commissioners negotiates labor agreements with the teachers. *See,* City Charter, Art. VII, Sec. 59. Such agreements are specifically denominated "collective bargaining agreements" in the City Charter. *Id.* The process, however, is much the same as with labor agreements negotiated under the Municipal Employee Relations Ordinance. The Board of School Commissioners negotiates the terms and conditions of employment including levels of compensation, and submits a recommendation to the Board of Estimates for approval. The Board then includes the Commissioners' budget in the Ordinance of Estimates and the Ordinance is enacted into law by the City Council.

■ By approving the bargained for levels of compensation, and enacting the Ordinance of Estimates into law, the City clearly imposed contractual obligations on itself. *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977).[5] In *United States Trust,* the Supreme Court held that a statutory scheme will be treated as creating contractual obligations where the "language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the [government]." *Id.*

at 17. Given that the Municipal Employee Relations Ordinance, and other provisions of the City Charter, call for a bargained for agreement between City employees and the City, the Court concludes that the City intended by this statutory scheme, to create private rights of a contractual nature, enforceable against the City.

■ Having determined that a contractual relationship exists between the parties, the inquiry turns to whether the Furlough Plan, in fact, operated as a substantial impairment of that relationship. The City argues that the Furlough Plan operates as a minimal impairment at best, and does not rise to the level of impairment meriting contract-clause analysis.

The severity of an impairment measures the height of the hurdle the city ordinance must clear. "Minimal alterations of contractual obligations may end the inquiry at its first stage." *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 245, 98 S.Ct. 2716, 2723, 57 L.Ed.2d 727 (1978). Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the legislation. *Id.* The impairment is to be mea-

tem. *Baltimore v. American Federation of State, etc.,* 281 Md. 463, 379 A.2d 1031 (1977). The Board formulates, determines and executes the fiscal policy of the City. Article VI, § 2(a).

Labor Agreements setting forth rates of compensation for city employees are negotiated between the City and its employees, then submitted to the Board of Estimates for approval. The Memorandum is merely a "recommendation," and the Board, in its discretion may decide to accept, modify or reject the terms of the Memorandum. *Id.*

For each fiscal year, the Board prepares and submits an "Ordinance of Estimates" to the City Council. This proposed ordinance must contain, among other things, a breakdown of the compensation of every officer and salaried employee of the City.

In reviewing the proposed Ordinance of Estimates, the City Council has only limited powers. It may reduce or eliminate any of the amounts fixed by the Board, but it may not increase the amounts, or insert any amount for any new purpose. Once the Ordinance of Estimates has been approved, it becomes law.

**5.** Compare the holding in *Baltimore v. American Federation of State,* 281 Md. 463, 379 A.2d 1031

(1977) ("AFSCME"). In *AFSCME,* the Maryland Court of Appeals considered whether the Municipal Employee Relations Ordinance ("MERO") authorized the Board of Estimates to enter into a collective bargaining agreement directly with City employees. The Court concluded that the MERO provides for negotiations between employees and employer representatives, usually a municipal committee appointed jointly by the Mayor and the respective City unions. The ordinance does not contemplate negotiations between City employees and the Board of Estimates directly; nor does it authorize the Board to enter binding agreements with City employees. The Board's function, the Court said, is to consider committee recommendations and decide, based on its assessment of the total budget, whether to reduce, reject or otherwise modify the recommendations submitted.

By holding that the Board of Estimates may not bind itself directly, the State Court did not hold that a labor agreement validly negotiated between the proper committee and union, does not carry the force of a contract. In fact, the Court suggests that a validly negotiated labor agreement becomes binding when it is approved by the Board of Estimates, and incorporated into the Ordinance of Estimates.

sured against the legitimate expectations of the contracting parties. *United States Trust Co.*, 431 U.S. at 19–20 n. 17, 97 S.Ct. at 1516; *Spannaus*, 438 U.S. at 245–46, 98 S.Ct. at 2723; *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983). "Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them." *Spannaus*, 438 U.S. at 245, 98 S.Ct. at 2723. Total destruction of contractual expectations is not necessary to find a substantial impairment. *United States Trust Co.*, 431 U.S. at 26–27, 97 S.Ct. at 1520; *Energy Reserves Group v. Kansas Power & Light*, 459 U.S. at 411, 103 S.Ct. at 704.

In light of the Supreme Court's reasoning in *Spannaus*, the City's argument that the contractual impairment created by the Furlough Plan was "minimal", must fail. Plaintiffs bargained in good faith over the issues of wages and the terms and conditions of employment. Wages are expressed on an annual basis, each employee earning a defined annual salary.[6] Once a fiscal year has begun, an employee has every reason to expect that the wage rates fixed for that year will remain constant throughout the year.

For the five pay periods that the Plan was in effect, City employees lost the equivalent of 2.5 days of pay. City employees were justifiably relying on full paychecks to pay for such essentials as food and housing. It would be contradictory to hold that this impairment was necessary because of a governmental fiscal crisis, and to do so by disregarding the *personal* fiscal crises that the Furlough Plan would create.[7]

The impairment of the City's contractual obligations to City employees was substantial; but the inquiry does not end here. Finding a substantial impairment is merely a threshold step toward resolving the more difficult question of whether that impairment is permitted under the Constitution. *United States Trust Co., supra.* This more difficult question is resolved by balancing the contractual rights of the individual against "the 'essential attributes of sovereign power' necessarily reserved by the States to safeguard the welfare of their citizens." *Id.* [cite omitted]; *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428, 54 S.Ct. 231, 236, 78 L.Ed. 413 (1934) ("reservation of essential attributes of sovereign power is ... read into contracts as a postulate of the legal order"); *El Paso v. Simmons*, 379 U.S. 497, 508, 85 S.Ct. 577, 583, 13 L.Ed.2d 446 (1965) (state may protect public welfare notwithstanding interference with public contracts); *Atlantic C.L.R. Co. v. Goldsboro*, 232 U.S. 548, 558, 34 S.Ct. 364, 368, 58 L.Ed. 721 (1914) (state police power is "inalienable even by express grant"). *See also, Maryland State Teachers Asso. v. Hughes*, 594 F.Supp. 1353, 1360 (D.Md.1984) ("[the] reserved powers doctrine renders void *ab initio* a state contract which 'surrenders an essential attribute of [State] sovereignty,'" since a "legislature cannot bargain away the police power of a State.") (quoting, *United States Trust, supra*, 431 U.S. at 23, 97 S.Ct. at 1518).

The authority to regulate the compensation of municipal employees, is within the police power of City government. *See Maryland State Teachers*, 594 F.Supp. at 1360 (citing *Newton v. Commissioners*, 100 U.S. 548, 559, 25 L.Ed. 710 (1879) (under the police power a state may "increase or diminish the salary or change the mode of compensation" of its employees)); *Arceneaux v. Treen*, 671 F.2d 128, 135 (5th

---

**6.** Wages are negotiated from year-to-year. Thus, this case does not present the impermissible situation in which one legislature attempts to bind a subsequent legislature for work and services to be performed by State employees and teachers in the future. *Maryland State Teachers Asso. v. Hughes*, 594 F.Supp. 1353 (D.Md.1984) (citing *United States Trust, supra.*)

**7.** Plaintiffs point out that in adopting the Ordinance of Estimates for fiscal year 1992, the City rejected a previously promised 6% wage increase for city employees. Other than promotion and longevity increases, City employees did not receive a wage increase for Fiscal 1992.

Cir.1982); *Amalgamated Transit Union v. Massachusetts v. Commonwealth of Massachusetts*, 666 F.2d 618, 641 (1st Cir.1981), cert. den 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982).

■ But, as the Supreme Court explained in *United States Trust*, the police power of a state does not authorize unlimited governmental modification of public contracts. *Id.* 431 U.S. at 25, 97 S.Ct. at 1519. Indeed, impairments of a government's own contracts require a more stringent examination under the Contract Clause than would laws regulating contractual relationships between private parties:

> The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations. As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.

*United States Trust Co.*, 431 U.S. at 25–26, 97 S.Ct. at 1519.

■ Critical to the issue of whether an impairment is constitutionally permissible, is (1) whether the legislation is reasonable and necessary to serve an important public purpose and (2) whether the City can offer policy justifications for its selection of means to effect that purpose. *Id.* See, *A Process Oriented Approach to the Contract Clause*, 89 Yale Law Journal 1623 (1980). *See also, Association of Surrogates & Supreme Court Reporters v. New York*, 940 F.2d 766 (2nd Cir.1991); *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56, 60, 55 S.Ct. 555, 556, 79 L.Ed. 1298 (1935) (security of public bond may not be reduced without reason when public welfare may be served by less severe impairment); *W.B. Worthen Co. v. Thomas*, 292 U.S. 426, 434, 54 S.Ct. 816, 819, 78 L.Ed. 1344 (1934) (debtor-relief law with no time, amount, circumstance, or need limits violates contract clause when less severe impairment would serve public goals).

■ There is little dispute among the parties that attending to the City's fiscal health in the midst of an unforeseen fiscal crisis is a legitimate public purpose. The parties differ as to the means chosen to effect that purpose. The City argues that despite the fact that anticipated cuts in State aid were reduced from 13.3 million dollars to 4.6 million dollars, the effects of the cuts in State aid, the State court's order prohibiting wage cuts for fire fighters and the take-over of the Baltimore City Jail by the State with concomitant employee payouts, have combined to cause an unhealthy fiscal condition.

The actual cuts in State aid amounted to .228% of the City's $2 billion dollar budget for fiscal year 1992 (Aff. McCarthy, PH.D. ¶ 4).[8] Despite the City's claims of fiscal distress, the City allocated 4.8 million of its operating funds to "pay-as-you-go" programs, which Plaintiffs allege, are usually

---

8. Defendants argue that the magnitude of the State cuts should be compared to the general fund of the City Budget, and not to the budget as a whole. If compared to the General Fund, the State cuts amount to .65% of the total budget. Defendants argue that the City only has discretionary spending control over the general fund, and that the general fund is the "primary fund which is affected by the reductions in State aid." Defendants contention is without merit. The entire City operating and capital budgets are ultimately controlled by the City. Each municipal agency submits an operating budget

recommendation. The Board of Estimates considers the recommendations, and makes adjustments as it sees fit. City Charter, Article 6, § 2. The proposals are then incorporated into the Ordinance of Estimates, and submitted to the City Council. The Council may also make changes, though its powers to do so are somewhat more limited. *Id.* Furthermore, the City Charter authorizes the Board of Estimates, and the City council, to take such action as is necessary to adjust the City's budget when faced with budgetary shortfalls. City Charter, Article VI § 2

reserved for programs when the City anticipates a fund surplus. The City reduced its property taxes by five cents per $100 of assessed value (from $5.95 to $5.90), turning back $3.9 million dollars to taxpayers.

At the end of fiscal 1991, a balance of $40 million dollars remained unspent in the City's general fund. Of this total, $30 million was reserved for various uses, $7.4 million was designated for use in fiscal year 1992, and the remainder, $2.6 million, was left "undesignated." (Aff. McCarthy ¶ 5(a); Aff. Gallagher ¶ 7). In contrast, by the City's own admission, the savings recaptured through implementation of the Furlough Plan, was a mere $2 million dollars.

Based on these facts, it cannot be said that the Furlough Plan was reasonable and necessary to avert a fiscal crisis. Alternatives always exist to imposing the costs of budgetary shortfalls on a class of contracting parties such as city employees. The City could have shifted the burden from another governmental program, or it could have raised taxes; an option the Court recognizes would not have been popular among politician-legislators. But the contract clause exists exactly for that reason, as a constitutional check on governmental legislation. In *Hall v. Wisconsin*, 103 U.S. 5, 26 L.Ed. 302 (1880), the Supreme Court opined:

> But when the legislature makes a contract with a public officer, as in the case of a stipulated salary for his services during a limited period, this, during the limited period, is just as much a contract, within the purview of the constitutional prohibition, as a like contract would be between two private citizens.

103 U.S. at 10 (quoting from *Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 694, 4 L.Ed. 629 (1819) (Story, J., concurring)).

In *Association of Surrogates, supra,* the State—in the midst of a budget crunch and an overworked court system—sought to solve both problems by implementing a "lag-payroll" scheme to finance the expansion of its court system. Under the scheme, the wages of certain court personnel would be deferred in a manner that was contrary to their collective bargaining agreements:

> In fact, the lag-payroll scheme smacks of the political expediency that *United States Trust Co.* warned of: "A governmental entity can always find a use for extra money, especially when taxes do not have to be raised." [cite omitted] Clearly, the New York legislators and its governor would prefer not to raise the taxes of their constituents; by placing the costs of improvements to the court system on the few shoulders of judiciary employees instead of the many shoulders of the citizens of the state, they ruffle only a few feathers and fight the "exploding drug crisis" without raising taxes or cutting other governmental programs. But the only people paying for the new courts are the few employees of the judicial branch who are subjected to the lag payroll. The contract clause bars such expedient *post hoc* changes in contractual obligations, for "a State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives." [cite omitted].

*Association of Surrogates*, 940 F.2d at 773 (quoting *United States Trust Co., supra*).

Defendants next contend that the Furlough Plan was authorized by the "Neall Amendment" to the Budget Reconciliation Act. The Neall Amendment provides:

> "the governing body of ... Baltimore City, or other legal entity or authority within ... Baltimore City, may take any action necessary, including any action to reduce a previously approved appropriation, to prudently manage its fiscal affairs and to meet its obligations under this Act. This Section may not be interpreted to authorize additional taxation authority."

1992 Md.Laws ch. 62, Sec. 3(c). The Amendment is cast in broad language, and does not specifically authorize the unconstitutional impairment of pre-existing contracts. In fact, the Amendment does not direct any 'specific' action. Thus there is no need to rule on the constitutionality of

this provision at this time, and the motion for leave to intervene filed by the State of Maryland on this issue will be denied. To the extent, however, that this provision authorizes the City of Baltimore to unconstitutionally impair its contractual obligations with City employees, it is invalid.

Summary judgment is mandated if a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The City has failed to establish that the Furlough Plan was a reasonable and necessary impairment of its contractual obligations with City employees. Accordingly, summary judgment will be entered in favor of the Plaintiffs.