T.C. Memo. 1996-267

UNITED STATES TAX COURT

G. RICHARD AND SARA B. CHILDS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7442-94.                    Filed June 11, 1996.

G. Richard Childs and Sara B. Childs, pro sese.

<u>Alan R. Peregoy</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, <u>Judge</u>:  This case was assigned to Special Trial
Judge Robert N. Armen, Jr., pursuant to the provisions of section
7443A(b)(4) of the Internal Revenue Code of 1986, as amended, and
Rules 180, 181, and 183.[1]  The Court agrees with and adopts the
Opinion of the Special Trial Judge, which is set forth below.

---

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for 1990, the taxable year in
issue, and all Rule references are to the Tax Court Rules of
Practice and Procedure.

OPINION OF THE SPECIAL TRIAL JUDGE

ARMEN, Special Trial Judge:  Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1990 in the amount of $29,434.

The only issue for decision is whether the distribution received by petitioner Sara B. Childs from her individual retirement account in 1990 is taxable under sections 408(d)(1) and 72 or whether such distribution qualifies for relief pursuant to section 408(d)(4).

FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found.  Petitioners resided in Forest Hill, Maryland, at the time that their petition was filed with the Court.

Petitioner Sara B. Childs (petitioner) was a teacher in the Baltimore County Public Schools until she retired on November 1, 1989.

Petitioner's Transfer Refund Distribution

As an employee of the Baltimore County Public Schools, petitioner was originally a member of the Maryland State Teachers' Retirement System (the Retirement System).  However, on September 29, 1989, petitioner elected to transfer to the Maryland State Teachers' Pension System (the Pension System).

Petitioner's election to transfer from the Retirement System to the Pension System was effective October 1, 1989.[2]

As a result of her election to transfer to the Pension System, petitioner received a distribution (the Transfer Refund) from the Retirement System in the amount of $342,956.85. Petitioner received the Transfer Refund in the form of a check dated October 31, 1989, from Maryland State Retirement Systems.

Petitioner's Transfer Refund consisted of $31,422.04 in previously taxed contributions made by petitioner during her employment tenure with the public schools, $2,169.77 in taxable employer "pick-up contributions",[3] and $309,365.04 of taxable earnings in the form of interest. The earnings and "pick-up contributions", which total $311,534.81, constitute the taxable portion of the Transfer Refund.

Rollover of Petitioner's Transfer Refund

Within 60 days of receiving the Transfer Refund, petitioner deposited the taxable portion thereof, i.e., $311,534.81, into three individual retirement accounts (IRA's), as follows:

Petitioner deposited $221,534.81 of the Transfer Refund into an IRA with Fidelity Investment Mutual Funds (the Fidelity IRA).

---

[2] For a discussion of the Retirement System and the Pension System, see generally Hylton v. Commissioner, T.C. Memo. 1995-27; Hoppe v. Commissioner, T.C. Memo. 1994-635; Hamilton v. Commissioner, T.C. Memo. 1994-633; Conway v. United States, 908 F. Supp. 292 (D. Md. 1995); Maryland State Teachers Association v. Hughes, 594 F. Supp. 1353, 1357-1358 (D. Md. 1984).

[3] See sec. 414(h)(2).

On December 6, 1989, petitioner opened two IRA's with First American Bank (the First American IRA's) and deposited $45,000 in each account. In opening the First American IRA's, petitioner read the "terms and conditions" for such accounts that were enumerated on the IRA application form. The terms and conditions did not set forth any procedure for withdrawing funds from an IRA.

Distribution of the First American IRA's

Before she retired, petitioner sought advice from the Internal Revenue Service (IRS) and the Maryland State Retirement Agency (MSRA) regarding the taxability of a Transfer Refund. Employees from the IRS advised petitioner that the Transfer Refund would be considered a lump-sum distribution and that it would qualify for tax-free treatment if the distribution were rolled over into an IRA within 60 days of receipt. Petitioner's contact with the MSRA also led petitioner to believe that the Transfer Refund was eligible for tax-free rollover treatment. Thus, at the time petitioner received the Transfer Refund, she thought that the taxable portion qualified for tax-free rollover treatment.

On March 28, 1990, the MSRA mailed a letter to all Transfer Refund recipients, including petitioner, indicating that the Transfer Refund was probably a taxable distribution. The letter advised the Transfer Refund recipients to contact a tax adviser or the IRS if they had any questions.

In response to the March 28, 1990, letter, petitioner Richard Childs requested tax advice from Martin F. Malarkey III, Chief of the Quality Assurance Branch of the IRS. In anticipation of a forthcoming ruling concerning the tax consequences of the Transfer Refund, Mr. Malarkey advised petitioners to apply for an extension of time to file their 1989 Federal income tax return. Mr. Malarkey further advised petitioners to withdraw all funds from their IRA's prior to the extended due date for filing and to include the amounts withdrawn in their gross income for 1989.

On April 12, 1990, petitioners applied for and received an automatic, 4-month extension of time to file their 1989 income tax return. Petitioners' return for that year was therefore due on or before August 15, 1990.

On July 10, 1990, the IRS issued a ruling (the IRS ruling) in which the IRS concluded that Transfer Refunds did not generally qualify for tax-free rollover treatment.

Petitioners were aware that the IRS ruling required them to include the taxable portion of petitioner's Transfer Refund, i.e., $311,534.81, in their gross income for 1989. Petitioners were also aware that if they did not withdraw the funds from petitioner's IRA's on or before August 15, 1990, then the IRS would also seek to tax such amount upon distribution from the IRA's.

Petitioners frequently observed advertisements encouraging customers of various financial institutions to conduct their banking by telephone. Petitioners assumed that they could withdraw funds from petitioner's IRA's by requesting telephonically that such accounts be converted into nonqualified (non-IRA) accounts.

During the last week of July 1990, petitioner telephoned First American Bank and requested that her First American IRA's be converted into non-IRA accounts prior to August 15, 1990. Petitioner explained to the First American Bank employee with whom she spoke (the First American employee) why such a conversion was necessary. The First American employee told petitioner that she, the employee, would be glad to convert petitioner's accounts and assured petitioner that petitioner's request would be carried out. Based on the representations made by the First American employee, petitioner concluded that all of the steps necessary to withdraw her funds from the First American IRA's had been completed.

Contrary to what petitioner had been told by the First American employee, First American Bank required IRA owners to execute various documents when transferring funds out of an IRA. The First American employee, in assuring petitioner that petitioner's IRA's would be converted to non-IRA accounts with no further action on petitioner's part, misrepresented the bank's internal procedure of converting an IRA into a non-IRA account.

Petitioner, unaware that she was required to execute various documents in order to accomplish the desired conversion, did not execute these documents prior to August 15, 1990. Thus, the funds in petitioner's First American IRA's were not distributed to and received by petitioner prior to August 15, 1990.

First American Bank distributed and petitioner received the account balance of petitioner's IRA's, i.e., $97,227.74, on or about November 6, 1990.

Distribution of the Fidelity IRA

Petitioners were accustomed to dealing with Fidelity by telephone. On August 14, 1990, petitioner Richard Childs telephoned Fidelity and requested that the account balance in petitioner's Fidelity IRA be transferred into a non-IRA account. Fidelity permitted customers to convert IRA's into non-IRA accounts by instructions given over the telephone. Thus, Fidelity effected the requested conversion, and the account balance in petitioner's Fidelity IRA was constructively withdrawn and received by petitioner on August 14, 1990.

Petitioners' 1989 Return

On their Federal income tax return (Form 1040) for 1989, filed August 15, 1990, petitioners included the taxable portion of the Transfer Refund in gross income.

Petitioners' 1990 Return

On their Federal income tax return (Form 1040) for 1990, petitioners disclosed the receipt of a distribution from petitioner's IRA's in the amount of $317,917. Of this amount, petitioners reported the earnings on petitioner's First American IRA's, i.e., $7,228, as the taxable amount.[4]

The Notice of Deficiency

In the notice of deficiency, respondent determined that $90,000 of the amount distributed in November 1990 from petitioner's First American IRA's was the return of an excess contribution to an IRA and, as such, was includable in petitioners' gross income for 1990 pursuant to sections 408(d)(1) and 72.

OPINION

Generally, any amount "paid or distributed out of" an IRA is includable in gross income by the taxpayer in the manner provided by section 72.[5] Sec. 408(d)(1). As relevant herein, section 72(e)(2)(B) provides that amounts received before the annuity starting date are includable in income to the extent allocable to

---

[4] Petitioners also filed an amended return (Form 1040X) for 1990; however, the entries made therein do not affect our disposition of the disputed issue.

[5] For purposes of sec. 72, all IRA's of an individual are treated as one contract, and all distributions during a taxable year are treated as one distribution. Sec. 408(d)(2).

income on the contract and not includable in income to the extent allocable to the investment in the contract.[6]

Section 408(d)(4) sets forth an exception to the foregoing general rule. As applicable to the present case, section 408(d)(4) provides that if an excess contribution is distributed to and received by the contributor on or before the due date of the return (including extensions) for the year of the excess contribution, then such excess contribution is not includable in the contributor's gross income.[7]

Petitioner made total excess contributions to her three IRA's in the amount of $309,534.81 (i.e., $311,534.81 less

_____

[6] Under sec. 72(c)(4), "annuity starting date" is defined as the first day of the first period for which an amount is received as an annuity under the contract. Petitioner received a single payment in the amount of $97,227.74 from her First American IRA's prior to drawing annuity payments from her First American IRA's. Thus, the distribution was received by petitioner before the annuity starting date and, accordingly, sec. 72(e)(2)(B) applies.

[7] Sec. 408(d)(4) provides:

(4) Contributions Returned Before Due Date of Return.-- * * * [section 72] does not apply to the distribution of any contribution paid during a taxable year to an individual retirement account * * * if--

(A) such distribution is received on or before the day prescribed by law (including extensions of time) for filing such individual's return for such taxable year,

(B) no deduction is allowed under section 219 with respect to such contribution, and

(C) such distribution is accompanied by the amount of net income attributable to such contribution.

$2,000) in 1989.  See sec. 219(a), (g); sec. 4973(b).  The contribution to petitioner's Fidelity IRA in the amount of $221,534.81 was distributed to and received by petitioner on August 14, 1990, and is not at issue in this case.  Sec. 408(d)(4).

At issue in this case is whether the distribution of petitioner's excess contributions from her First American IRA's made on November 6, 1990, in the amount of $88,000 (i.e., $309,534.81 less $221,534.81) qualifies for relief pursuant to section 408(d)(4).

In order to qualify for relief under section 408(d)(4), the excess contributions made by petitioner to her First American IRA's must have been received by petitioner on or before August 15, 1990, the extended due date for petitioners' 1989 income tax return.  Petitioner received the excess contributions on or about November 6, 1990, almost 3 months after the time prescribed by section 408(d)(4).  Thus, respondent contends that petitioners do not satisfy the requirement in section 408(d)(4)(A) that the distribution of an excess contribution must be received on or before the due date for filing the taxpayer's return for the taxable year of the contribution.[8]  To the contrary, petitioners contend that they are entitled to relief under section 408(d)(4) based on Wood v. Commissioner, 93 T.C. 114 (1989).

---

[8] Respondent does not contend that petitioners failed to satisfy any of the remaining requirements of sec. 408(d)(4).

Wood v. Commissioner, supra, involved a distribution of cash and stock from a profit-sharing plan to a taxpayer, who then established an IRA. In that case, the taxpayer was aware that his distribution was required to be rolled over into an IRA within 60 days of receipt. Acting with such knowledge, the taxpayer did everything that he could reasonably be expected to do in order to roll over his lump-sum distribution as required by law. Thus, for example, the taxpayer met with an IRA trustee, instructed the IRA trustee to open an IRA, executed the documents necessary to open such IRA, and transferred the entire distribution to the IRA trustee for deposit in his IRA. The IRA trustee assured the taxpayer that the taxpayer's request would be carried out.

However, because of a bookkeeping error by the IRA trustee, certain of the trustee's records indicated that part of the distribution had not been transferred to the IRA account within the requisite 60-day period. We held that the financial institution's bookkeeping error did not preclude rollover treatment because, in substance, the taxpayer had satisfied the statutory requirements. We think that the circumstances in the present case are comparable to those in Wood v. Commissioner, supra.

Petitioners, like the taxpayer in Wood, acted with knowledge of the law. The record demonstrates that petitioners were extremely attentive to the tax consequences of petitioner's

Transfer Refund, its rollover into petitioner's IRA's, and the subsequent distributions from petitioner's IRA's. Thus, petitioners were acutely aware of the requirement of the operative law; namely, that they actually or constructively withdraw and receive petitioner's excess contributions from the IRA's on or before August 15, 1990, in order to avoid the inclusion of such amounts in petitioners' gross income for 1990.

Petitioner, also like the taxpayer in Wood, did everything that she could reasonably be expected to do in order to comply with the law. Although First American Bank's internal procedures did not provide for the conversion of an IRA into a non-IRA account by telephone, the First American employee did not advise petitioner of that policy. Instead, she assured petitioner that she, the employee, would convert petitioner's accounts within the requested time frame. Further, the First American employee assured petitioner that petitioner had done all that was necessary to accomplish such a conversion.

We found petitioner's testimony concerning petitioner's instructions to the First American employee and the employee's agreement to follow those instructions to be credible. The First American employee represented that petitioner had done everything necessary to convert her IRA into a non-IRA account, and that the bank would carry out petitioner's instructions. Petitioner reasonably relied on that representation. Under these circumstances, we conclude that petitioner took all steps that

one might reasonably expect her to have taken in order to convert her IRA's into non-IRA accounts by August 15, 1990, and was entitled to have her instructions carried out immediately.

We also note that events independent of petitioner's conversation with the First American employee support petitioners' assumption that the conversion of petitioner's First American IRA's could be effected by telephone. First, petitioners were able to withdraw and receive the account balance from the Fidelity IRA by telephone. Second, petitioners frequently observed advertisements encouraging customers to conduct their banking telephonically. Third, the terms and conditions governing petitioner's First American IRA's did not set forth a procedure for closing an IRA, and thus did not put petitioner on notice that she could not close her First American IRA's by telephone.

In reasonably relying on the First American employee's representation, petitioner did everything that she could reasonably be expected to do in order to comply with the relief provision of section 408(d)(4). We therefore hold that petitioners are not precluded from relief under that section because of the error made by the First American employee. Accordingly, petitioners are not liable for income tax on the distribution of the excess contributions from petitioner's First American IRA's in 1990.

In order to reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioners</u>.